# United States Court of Appeals
## For the First Circuit

No. 05-1552

STACEY STANTON,

Plaintiff, Appellant,

v.

METRO CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,

and DiClerico,[*] District Judge.

John P. Donohue with whom Fuller, Rosenberg, Palmer & Beliveau, LLP was on brief for appellant.
Robert A. Bertsche, with whom Amy E. Serino and Prince, Lobel, Glovsky & Tye LLP, were on brief for the appellee.

February 23, 2006

---

[*]Of the District of New Hampshire, sitting by designation.

**DiClerico**, **District Judge**.  Stacy Stanton has appealed the dismissal of her state-law defamation action against Metro Corp., which arises out of the publication of her photograph alongside an article entitled "The Mating Habits of the Suburban High School Teenager."  The district court dismissed Stanton's complaint for failure to state a claim upon which relief could be granted based on the conclusion that the publication was not defamatory as a matter of law.  Because we believe this conclusion was erroneous, and because Metro's alternative arguments for affirmance are not well-founded, we reverse the decision of the district court and remand for further proceedings.

**I.**

Metro Corporation publishes Boston magazine, a monthly general interest publication that ran the article in question in its May 2003 issue.  The cover of the magazine refers to the article with the phrase, "Fast Times at Silver Lake High:  Teen Sex in the Suburbs."  Inside, Stanton is one of five young people pictured in a photograph that occupies the entire first page of the article and half of the facing page.  The photograph, taken at a high school dance, depicts its three male and two female subjects in formal attire, sitting and standing near an open exit door in the background.  Stanton's image occupies most of the left-hand side of the photograph, where she appears standing, with her face

-2-

and most of her body fully visible.  Although three of the subjects are smoking cigarettes, and another holds a plastic cup, Stanton simply looks at the camera, smiling faintly.

The other half of the facing page consists of a column of text of varying sizes, including the aforementioned headline, which appears in the largest font and takes up most of the column.  A "superhead," appearing above the headline in a smaller font, reads: "They hook up online.  They hook up in real life.  With prom season looming, meet your kids--they might know more about sex than you do."  Below the headline, one and a half paragraphs of text from the article are set forth in yet smaller type, ending with an arrow indicating that the story continues onto the following page.  The byline and photography credit appear at the very bottom of the column in lettering larger than that of the main text, but smaller than that of the headline.

Just above the byline, and just below the main article text, the following appears in italicized type:  "The photos on these pages are from an award-winning five-year project on teen sexuality taken by photojournalist Dan Habib.  The individuals pictured are unrelated to the people or events described in this story.  The names of the teenagers interviewed for this story have been changed."[1]  These words are rendered in the smallest font on

---

[1]Because the parties and the district court refer to this statement as "the disclaimer," we adopt the same shorthand for purposes of our discussion here.

the page, which is otherwise devoid of text that explains the photograph or identifies its subjects.[2]  Stanton alleges that she did not participate in any such "project on teen sexuality."

The first few paragraphs of the article relate a conversation among four teenagers from a suburban Boston high school, including "Nicole," described as a "pretty Keri Russell-look-alike . . ." and "Christine, a curly-haired pixie in the under-90 weight range . . . ."  Nicole is quoted as saying, "All we ever do is go hang out and get drunk, like, *all* the time, and you know, hook up," not generally with steady boyfriends or girlfriends, but "with whoever [*sic*]" after drinking at small gatherings.  The article goes on to explain that the euphemism "hook up," as teens use it, "can mean anything from sexual intercourse to oral sex to serious touching or just kissing."

As these introductory paragraphs suggest, the thrust of the story is that teenagers in the greater Boston area have become more sexually promiscuous over the span of the last decade.  The article draws support for this thesis from both statistical and anecdotal evidence, including interviews with a number of local high school students.  As to the possible causes for the trend, the article considers a "hypersexual" popular culture, the ready

---

[2]The article, which in its entirety occupies all or part of seven pages, includes four additional photographs of young people, none of which is accompanied by a caption or other explanatory text.

availability of sexual encounters and pornography over the Internet, ineffective sex education programs, and peer pressure.

The story also declares that high school has replaced college as the time for sexual experimentation, describes a profound ignorance among teens about sexually transmitted diseases, and notes a related trend of increased sexual aggression among high school boys. Parents, for their part, remain "overwhelmingly clueless," according to the article. Nevertheless, the story closes with the observation that some teens are "holding out hope" for emotionally rewarding sexual relationships, including "Jessica," one of the teenagers from the group described at the beginning of the article.

Stanton, who lives in Manchester, New Hampshire, responded to the appearance of her photograph with the article by filing suit against Metro in Massachusetts state court. Metro, a Pennsylvania corporation with its principal place of business also in that state, duly removed the action to the district court.

Stanton's amended complaint asserts two counts: invasion of privacy in violation of Mass. Gen. Laws ch. 214, § 1B, and common-law defamation. Stanton alleges that the publication was defamatory in that "[t]he juxtaposition of [her] photograph and the text describing suburban teenage promiscuity . . . insinuated that [she] was engaged in the activity described in the article . . . ." She also alleged that the disclaimer was itself defamatory in

falsely identifying her as a subject of the photographer's "project on teen sexuality." The district court granted Metro's motion to dismiss on the ground that the amended complaint failed to state a claim on which relief could be granted. This appeal followed.

## II.

We review the district court's grant of the motion to dismiss de novo. SFW Arecibo, Ltd. v. Rodriguez, 415 F.3d 135, 138 (1st Cir.) (citing Greene v. Rhode Island, 398 F.3d 45, 48 (1st Cir. 2005)), cert. denied, 126 S. Ct. 829 (2005). This task requires that we accept as true the well-pleaded factual allegations of the complaint, drawing all reasonable inferences in favor of the non-moving party. Id. at 138-39. As the district court did, we also consider the allegedly defamatory article itself, which Metro submitted as an attachment to its motion to dismiss. See Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988). "'A complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" Greene, 398 F.3d at 48 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

Stanton has appealed only the dismissal of her defamation claim. Furthermore, she has appealed the dismissal of that claim only insofar as it arises out of the juxtaposition of her

photograph with the article; she does not contest the district court's determination that the disclaimer was not independently defamatory in misidentifying her as a participant in the teen sexuality study. We limit our review accordingly. See, e.g., Exec. Leasing Corp. v. Banco Popular de P.R., 48 F.3d 66, 67 (1st Cir. 1995).

## III.

To succeed on a defamation claim under Massachusetts law, a plaintiff must show that the defendant was at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his or her reputation in the community and which either caused economic loss or is actionable without proof of economic loss. White v. Blue Cross & Blue Shield of Mass., Inc., 442 Mass. 64, 66, 809 N.E.2d 1034, 1036 (Mass. 2004); see also Yohe v. Nugent, 321 F.3d 35, 40 (1st Cir. 2003) (applying Massachusetts law); Ravnikar v. Bogojavlensky, 438 Mass. 627, 629-30, 782 N.E.2d 508, 510-511 (Mass. 2003). Metro moved to dismiss Stanton's complaint on the grounds that (1) the publication was not defamatory, i.e., capable of damaging her reputation, as a matter of law, (2) any defamatory statement was not "of and concerning" her, (3) Metro could not have acted negligently in publishing the article, and (4) Stanton failed to allege that the article contained any false statement of fact.

The district court accepted two of these arguments, ruling that "the defamatory statements at issue are not 'of and concerning' [Stanton], and are not reasonably capable of a defamatory meaning." 357 F. Supp. 2d 369, 382 (D. Mass. 2005). In reaching these conclusions, the district court relied heavily on the disclaimer appearing at the bottom of the first column of the article, i.e., "[t]he individuals pictured are unrelated to the people or events described in this story." In fact, the district court stated that it would "first consider the juxtaposition of the photograph and the text without the disclaimer, and then turn to the impact of the disclaimer" in considering whether the article made a defamatory statement about Stanton. Id. at 378.

Bifurcating the article in this fashion, the district court determined that, absent the disclaimer, "a reasonable reader could conclude that the teenage girl depicted in the photograph is sexually active and engages in at least some form of sexual misconduct." Id. at 381. Nevertheless, the district court went on to explain that it was "forced to conclude that the disclaimer adequately negates the negative connotations about [the] plaintiff otherwise arising from the article and the photograph, at least in the mind of the reasonable reader." Id. We believe that the district court's calculus placed undue weight on the disclaimer in contravention of Massachusetts law.

We begin by focusing on the appropriate inquiry. We are not called upon to determine the ultimate issue of whether the article is defamatory, but to answer the "threshold question" of "'whether [the] communication is reasonably susceptible of a defamatory meaning . . . .'" Amrak Prods., Inc. v. Morton, 410 F.3d 69, 72 (1st Cir. 2005) (quoting Phelan v. May Dep't Stores Co., 443 Mass. 52, 56-57, 819 N.E.2d 550, 554 (Mass. 2004)). If the answer to this question is "yes," then the ultimate issue of whether the article is defamatory is not the court's to decide: "'[w]here the communication is susceptible of both a defamatory and nondefamatory meaning, a question of fact exists for the jury.'" Phelan, 443 Mass. at 56-57, 819 N.E.2d at 554 (quoting Jones v. Taibbi, 400 Mass. 786, 791-92, 512 N.E.2d 260, 264 (Mass. 1987)); see also Draghetti v. Chmielewski, 416 Mass. 808, 811, 626 N.E.2d 862, 866 (Mass. 1994); Restatement (Second) of Torts § 614 (1977). If the answer is "no," however, the defamation claim should be dismissed. See Amrak, 410 F.3d at 72 (citing Brauer v. Globe Newspaper Co., 351 Mass. 53, 55, 217 N.E.2d 736, 738 (Mass. 1966)).

"A communication is susceptible to defamatory meaning if it 'would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community.'" Amrak, 410 F.3d at 72 (quoting Phelan, 443 Mass. at 56, 819 N.E.2d at 553) (further internal quotation marks omitted); see also Mass. Sch. of Law at Andover, Inc. v. Am.

-9-

Bar Ass'n, 142 F.3d 26, 42 (1st Cir. 1998) (applying Massachusetts law); Milgroom v. News Group Boston, Inc., 412 Mass. 9, 12, 586 N.E.2d 985, 988 (Mass. 1992); Smith v. Suburban Rests., Inc., 374 Mass. 528, 529, 373 N.E.2d 215, 217 (Mass. 1978); Stone v. Essex County Newspapers, 367 Mass. 849, 853, 330 N.E.2d 161, 165 (Mass. 1975). In making this assessment, however, "[t]he communication must be interpreted reasonably," and can be ruled defamatory only if it would lead "a reasonable reader to conclude that it conveyed a defamatory meaning." Amrak, 410 F.3d at 72 (internal quotation marks omitted); see also Foley v. Lowell Sun Publ'g Co., 404 Mass. 9, 11, 533 N.E.2d 196, 197 (Mass. 1989); Restatement (Second) of Torts § 563 cmt. c (1977).

Although the district court correctly articulated these principles in its decision, it strayed from them in analyzing the publication at issue. The district court reasoned that, since "the disclaimer *directly* contradicts the otherwise-defamatory connection between the photograph and the text," the article could be susceptible to a defamatory meaning only if "a reasonable reader would overlook the disclaimer, misunderstand it, or fail to give it credence." 357 F. Supp. 2d at 381. According to the district court, no reasonable reader could do so because the disclaimer appears on the first page of the article and "[c]ertainly, the *reasonable* (or average) reader can be expected to read at least the

first page of a six-page article." Id. It was here that the district court erred.

While we acknowledge that the position of an item in a newspaper or magazine can bear on the question of defamatory import, see Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 2.4.2, at 2-19 (2004), we cannot assume, as the district court did, that placing a disclaimer on the first page of an article itself ensures that a reasonable reader will see it. Instead, we must examine the article "'in its totality in the context in which it was uttered or published'" and "'consider all the words used, not merely a particular phrase or sentence.'" Amrak, 410 F.3d at 73 (quoting Foley, 404 Mass. at 11, 533 N.E.2d at 197) (further internal quotation marks omitted); see also Salvo v. Ottaway Newspapers, Inc., 57 Mass. App. Ct. 255, 260, 782 N.E.2d 535, 540 (Mass. App. Ct. 2003); Restatement (Second) of Torts § 563 cmt. d (1977). Likewise, though we must "give weight to cautionary terms used by the person publishing the statement," Myers v. Boston Magazine Co., 380 Mass. 336, 341-42, 403 N.E.2d 376, 379 (Mass. 1980), the non-defamatory character of a statement will rarely depend solely on the presence of qualifying language. See, e.g., Cole v. Westinghouse Broad. Co., 386 Mass. 303, 309-12, 435 N.E.2d 1021, 1025-27 (Mass. 1982) (considering speaker's characterization of statement about plaintiff's firing as "unofficial" as one factor in whether statement defamatory); Restatement (Second) of Torts

-11-

§ 563 cmt. c (1977) ("A conditional or alternative statement may be defamatory if, notwithstanding its conditional or alternative form it is reasonably understood in a defamatory sense.").

Here, the disclaimer occupies the field between the body of the story and the byline, making it easy enough to overlook between the larger fonts of both.[3]  The disclaimer is also separated from the column of text by a horizontal line, accompanied by an arrow directing the reader to turn to the next page, where the story continues.  We cannot say that no reasonable reader would follow this visual signal and simply flip to the next page after reading the entirety of the text on the first page, but before reaching the disclaimer.

Nor can we say that any reasonable reader who notices the disclaimer would necessarily read the crucial second sentence, i.e., "[t]he individuals pictured are unrelated to the people or events described in this story."  It is at least conceivable that a reader might take the first sentence of the disclaimer, which states that "[t]he photos on these pages are from an award-winning five-year project on teen sexuality by photojournalist Dan Habib," as a satisfactory explanation of the photographs and therefore stop reading the disclaimer before the second sentence.  Such a reader

---

[3]When the first page of the article is reproduced on standard 8½-by-11-inch paper, the three sentences of the disclaimer together take up only one-half of a column inch, contrasted with the five and one-half column inches consumed by the headline and superhead.

-12-

would thus remain under the impression that the teenagers depicted in the photograph have some connection to the accompanying story.

Beyond the text and layout of the article itself, we must also consider "'the medium by which the statement is disseminated and the audience to which it is published'" in assessing its amenability to a defamatory meaning. Lyons v. Globe Newspaper Co., 415 Mass. 258, 263, 612 N.E.2d 1158, 1162 (Mass. 1993) (quoting Fleming v. Benzaquin, 390 Mass. 175, 180-81, 454 N.E.2d 95, 100 (Mass. 1983) (further internal quotation marks omitted)); see also Restatement (Second) of Torts § 563, cmt. d (1977). We note in this regard that the story appeared in Boston magazine, which Metro describes as "a general interest regional magazine . . . ." As the Restatement notes with regard to similar periodicals, "the public frequently reads only the headline of the article or reads the article itself so hastily or imperfectly as not to realize its full significance." Restatement (Second) of Torts § 563, cmt. d (1977). In light of this observation, we agree with the district court that "some percentage of readers who see the article, particularly casual readers who only glance at it or skim it, will ignore the disclaimer." 357 F. Supp. 2d at 381.

We have difficulty, however, in reconciling this aspect of the district court's analysis with its conclusion that no reasonable reader would disregard the disclaimer. The district court appears to have reasoned that the "percentage" of "casual

readers" who would disregard the disclaimer was not sizeable enough to represent what it called "the *reasonable* (or average) reader . . . ." 357 F. Supp. 2d at 381. But "[w]ords may be actionable even if they do not tend to damage a plaintiff's reputation or hold him up to ridicule in the community at large or among all reasonable people; it is enough to do so among a considerable and respectable class of people." Smith, 374 Mass. at 530, 373 N.E.2d at 217. Accordingly, in assessing whether a publication is susceptible to a defamatory meaning, it is not dispositive that a numerical majority of its audience would arrive at a non-defamatory interpretation. See King v. Globe Newspaper Co., 400 Mass. 705, 717-19, 512 N.E.2d 241, 248-49 (Mass. 1987) (reversing determination that article not susceptible to defamatory meaning based on views of "average reader" where reasonable that "considerable and respectable segment of the community" would nevertheless read article as discrediting plaintiff); Restatement (Second) of Torts § 559 cmt. e (1977) ("defamation is not a question of majority opinion").

Metro rejoins that, given the "express disclaimer," any reading of the article as defamatory toward Stanton is necessarily incorrect, so "it does not matter whether a 'considerable' number of people might unreasonably misunderstand the publication in such a way . . . ." But determining whether an allegedly defamatory statement can reasonably bear that construction as matter of law

-14-

should not be confused with a search for its meaning in the objective sense.  As the Supreme Judicial Court has explained,

> Whether a publication is defamatory or not presents a question as to the meaning of words which differs from that presented when a written contract comes before the court for construction.  In the latter case, the question is normally, what meaning a reasonable man, knowing all the relevant circumstances, give [*sic*] to the words of the document.  But a writing is a libel if, in view of all relevant circumstances, it discredits the plaintiff in the minds, not of the court, nor of wise, thoughtful, and tolerant men, nor of ordinary reasonable men, but of any considerable and respectable class in the community.

Ingalls v. Hastings & Sons Publ'g Co., 304 Mass. 31, 33, 22 N.E.2d 657, 658-59 (Mass. 1939) (internal citations and quotation marks omitted); accord Celle v. Filipino Reptr. Enters. Inc., 209 F.3d 163, 177 (2d Cir. 2000) ("the words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood by the public to which they are addressed") (internal quotation marks and emphasis omitted); Sack, supra, § 2.4.2, at 2-21 ("What counts is not the painstaking parsing of a scholar in his study, but how the newspaper article is viewed through the eyes of a reader of average interests.") (internal quotation marks omitted).

Thus, in deciding whether a statement is susceptible to a defamatory interpretation, the court must gauge the reasonableness of the interpretation based on what a considerable and respectable segment of the community would make of the statement.  Our recent decision in Amrak makes this clear.  There,

the plaintiff claimed that the defendants had "portrayed [him] as a homosexual by miscaptioning a picture of a homosexual individual with [the plaintiff's] name" in their publications. 410 F.3d at 71. The caption described the plaintiff as the "secret lover and one-time bodyguard" of pop star Madonna, but the accompanying photograph showed her in the company of one of her backup dancers, Jose Guitierez, who was not mentioned or described in the caption but who the plaintiff alleged was an "outspoken homosexual." Id.

We concluded that the publication in Amrak was not reasonably susceptible to a defamatory meaning because, to infer from the publication that the plaintiff was a homosexual, a reader would have to "follow Madonna and her cohort closely enough to recognize Guitierez as a gay man, but not closely enough to know Guitierez's name or what [the plaintiff] looks like. Few, if any, readers would fall into this considerable and respectable segment in the community." Id. at 73 (internal quotation marks omitted). Here, in contrast, we cannot say as a matter of law that too few readers would overlook the disclaimer to constitute a considerable and respectable segment of the community. The article is thus reasonably susceptible to a defamatory meaning.

In reaching this conclusion, we do not mean to suggest that language in the nature of a disclaimer can never serve to render a statement incapable of conveying a defamatory meaning. See, e.g., Myers, 380 Mass. at 341-43, 403 N.E.2d at 379-80 (ruling

-16-

that statement describing plaintiff as "only newscaster in town who is enrolled in a course for remedial speaking" could not reasonably be understood as defamatory in light of conspicuous language and accompanying cartoons "suggest[ing] that the expressed opinions will have an especially humorous inclination and fanciful tone"). We simply recognize that, given the placement of the disclaimer in the article and the nature of the publication in general, a reasonable reader could fail to notice it. As we said in Amrak, "[c]ontext matters," 410 F.3d at 72, and our examination of this article in context leads us to conclude it is reasonably susceptible to a defamatory meaning.

We also recognize that, as Metro argues, the article draws no literal connection between the subjects of the photograph and the subjects of its story. Under Massachusetts law, however, a statement need not explicitly refer to the plaintiff to constitute defamation. See Eyal v. Helen Broad. Corp., 411 Mass. 426, 430-31, 583 N.E.2d 228, 230-31 (Mass. 1991); New England Tractor-Trailer Training of Conn., Inc. v. Globe Newspaper Co., 395 Mass. 471, 480, 480 N.E.2d 1005, 1011 (Mass. 1985); accord Restatement (Second) of Torts § 564 cmt. b (1977). "'A plaintiff may establish that the defendant's words were of and concerning the plaintiff by proving at least that the defendant was negligent in publishing words which reasonably could be interpreted to refer to the plaintiff.'" Reilly v. Associated Press, 59 Mass. App. Ct.

-17-

764, 777, 797 N.E.2d 1204, 1215 (Mass. App. Ct. 2003) (quoting New England Tractor-Trailer, 395 Mass. at 479, 480 N.E.2d at 1011) (bracketing omitted), rev. denied, 441 Mass. 1103, 803 N.E.2d 33 (Mass. 2004); see also Elm Med. Lab., Inc. v. RKO Gen., Inc., 403 Mass. 779, 785, 532 N.E.2d 675, 679 (Mass. 1989).  Defamation can therefore arise from the publication of the plaintiff's photograph in conjunction with a defamatory statement, even in the absence of any express textual connection between the statement and the photograph.  Mabardi v. Boston Herald-Traveler Corp., 347 Mass. 411, 413-14, 198 N.E.2d 304, 306 (Mass. 1964); Morrell v. Forbes, Inc., 603 F. Supp. 1305, 1307 (D. Mass. 1985).

Like the question of whether a communication can reasonably be understood to be defamatory, whether a communication can reasonably be understood to be of and concerning the plaintiff depends on the circumstances.  New England Tractor-Trailer, 395 Mass. at 478 n.5, 480 N.E.2d at 1010 n.5 (quoting Restatement (Second) of Torts § 564 cmt. b (1977)).  Considering all the circumstances of the article's publication--save the disclaimer-- the district court concluded that based "on the juxtaposition of the text and the photograph . . . , a reasonable reader could conclude that the teenage girl depicted in the photograph [i.e., Stanton] is sexually active and engages in at least some form of sexual misconduct."  357 F. Supp. 2d at 381.

-18-

Essentially for the reasons stated by the district court, see 357 F. Supp. 2d at 378-79, we agree with this determination.[4] We go further, however, and say that the presence of the disclaimer does not permit the conclusion, as a matter of law, that the article is not of and concerning Stanton. "A defamatory comment is made 'of and concerning' the person to whom the reader or recipient, correctly or mistakenly but reasonably, understands it was intended to refer." Reilly, 59 Mass. App. Ct. at 777, 797 N.E.2d at 1215 (emphasis added). As we have explained, a reasonable reader could ignore the disclaimer, leaving the article with the impression—incorrect, but not unreasonable—that Stanton is the subject of the unflattering statements set forth in its text.[5] Once again, we do not intimate that this interpretation is

---

[4]We find the district court's incredulousness at "why was *this* photograph used to illustrate *this* article about sexual misconduct, if there is no connection between the two?," 357 F. Supp. 2d at 379, particularly incisive in this regard.

[5]Metro questions the district court's reliance on Mabardi, where the Supreme Judicial Court discerned a reasonable defamatory meaning in the publication of the plaintiff's photograph above a caption identifying him only by name and under the headline, "Settlement Upped $2,000--$400 Kickback Told." 347 Mass. at 412, 198 N.E.2d at 305. Metro seeks to distinguish Mabardi primarily on the ground that the court there noted the absence of any "textual reference" clarifying the plaintiff's lack of involvement in the malfeasance described in the article, id., 198 N.E.2d at 306, while the Boston magazine article bore a disclaimer to that effect. Again, because a reasonable reader could miss the disclaimer, this argument cannot carry the day. Metro also points out that its article, unlike the publication in Mabardi, did not identify Stanton by name. We view this as insignificant in light of the fact that Stanton is plainly recognizable in the large photograph occupying the first one and one-half pages of the article.

-19-

the only reasonable reading of the article. We say only that "[a]t this very preliminary stage, it does not appear beyond doubt that [Stanton] will be unable to prove a set of facts that would support a finding that [Metro's] statements were 'of and concerning [her]' under this standard." Eyal, 411 Mass. at 432, 583 N.E.2d at 231.

Metro also contends that Stanton's theory that running her photograph with the article "insinuated that [she] was engaged in the activity described in the article" fails to state a claim for defamation because "many of the activities described in the article can in no way be deemed harmful to the reputation of a suburban teen today . . . ." Metro characterizes these innocent activities as "attending a school prom, watching a Britney Spears video, abstaining from sex, vowing to avoid abusive relationships, or even lying about engaging in sex to defuse the pressure from peers who keep asking about it."

We agree with the district court that this argument rests on a tendentious reading of the article, "which is written in a sensational tone and overwhelmingly, if not exclusively, concerned with teenage sexual misconduct."[6] 357 F. Supp. 2d at 380. In assessing whether a statement can bear a defamatory construction, "[m]eaning is to be derived as well from the expression used as

---

[6]We also agree with the district court that "[e]ven the relatively harmless conduct identified by [Metro in support of its argument] is presented [in the article] in such a way as to underscore the principal theme of rampant and promiscuous sexuality among teenagers." 357 F. Supp. 2d at 380 (footnote omitted).

from the whole scope and the apparent object of the writer."  Sack, supra, § 2.4.2, at 2-19 (internal quotation marks omitted); accord Tartaglia v. Townsend, 19 Mass. App. Ct. 693, 697, 477 N.E.2d 178, 181 (Mass. App. Ct. 1985) (considering "tone of the article as a whole" in determining capacity for defamatory meaning).  Beginning with the superhead proclaiming that "your kids . . . might know more about sex than you," the article repeatedly and broadly avers that teenagers are sexually promiscuous.[7]  Furthermore, the article also consciously attempts to disabuse its readers--who, as the superhead indicates, are presumed to be the parents of teens--of any suspicion that its claims might be exaggerated.  For example, after describing alcohol- and drug-fueled sex parties among boys and girls as "much more common" than sex between a monogamous teen couple, the article asks, "Don't believe it?" and proceeds to offer the supporting opinion of a college psychology professor.

Thus, were the article understood to refer to Stanton, as we think it reasonably could be, "it would tend to hold [her] up to scorn, hatred, ridicule or contempt, in the minds of [a] considerable and respectable segment in the community."  Amrak, 410 F.3d at 73 (internal quotation marks omitted).  A reasonable reader

---

[7]These statements include that, among teenagers, "oral sex is the new second base" and "sex . . . is the new kissing"; that "no strings 'hooking up'--and Internet porn and online cybersex--[have] often replac[ed] dating"; and that "today's eastern Massachusetts teens are both sexually advanced . . . and sexually daring."  See also Am. Compl. ¶ 12 (quoting additional like statements).

could believe that Stanton, who appears in the lead illustration for the article, is in fact one of the teens whose promiscuous behavior is described in its text.[8]  At the risk of repeating ourselves, we allow that other reasonable readers may take a different view.  We conclude only that the article is susceptible to the defamatory meaning Stanton alleges, i.e., that she engages in sexually promiscuous conduct.[9]

In a similar vein, Metro argues that the article makes no "articulably false statement" about Stanton and thus cannot support a defamation claim.  The Supreme Judicial Court has recognized that certain statements about a plaintiff, though pejorative, are "too

---

[8]Metro concedes for purposes of this appeal that "a statement that [Stanton] was 'promiscuous' might damage her reputation in the community."  Accordingly, we need not decide whether a false accusation of promiscuousness is defamatory.  Cf. Restatement (Second) of Torts § 569 cmt. f (1977).

[9]Tropeano v. Atl. Monthly Co., 379 Mass. 745, 400 N.E.2d 847 (Mass. 1976), on which Metro relies, is not to the contrary. There, the defendant used a photograph of the plaintiff and three other women conversing in a nightspot to illustrate an article entitled, "After the Sexual Revolution."  Id. at 746, 400 N.E.2d at 848.  Based on the complaint, the court could discern  nothing about the article except that it "appear[ed] to deal with modern sexual and social mores."  Id.  Given the unremarkable nature of the photograph, and the plaintiff's failure to plead "any defamatory innuendo," id. at 751, 400 N.E.2d at 851, the court ruled that the publication was not defamatory.  Here, however, as we have already discussed, the article can reasonably be read to provide a considerably less clinical view of its subjects' sexual behavior. Furthermore, Stanton has alleged that the publication in this case made a defamatory insinuation about her.  See Mihalik v. Duprey, 11 Mass. App. Ct. 602, 607, 417 N.E.2d 1238, 1241 (Mass. App. Ct. 1981) (noting that Tropeano does not discuss theory of "false defamatory insinuation . . . to any significant extent"). Tropeano therefore does not support Metro's position.

-22-

vague to be cognizable as the subject of a defamation action." Nat'l Ass'n of Gov't Employees, Inc. v. Cent. Broad. Corp., 379 Mass. 220, 229, 396 N.E.2d 996, 1002 (Mass. 1979).  Because "[t]he meaning of these statements is imprecise and open to speculation . . . [t]hey cannot be proved false" and therefore "cannot be held libellous."[10]  Cole, 386 Mass. at 312, 435 N.E.2d at 1027 (internal quotation marks omitted).

We have already determined that one reasonable interpretation of the juxtaposition of Stanton's photograph with the "Mating Habits" article is that she engages in sexually promiscuous behavior.  That this juxtaposition might not permit a reader to definitively ascribe to Stanton any of the particular kinds of promiscuous conduct described in the article strikes us as unimportant.  "It is not necessary that the charge of indiscretions or want of chastity be direct and explicit; but anything fairly imputing immorality is actionable."  Thayer v. Worcester Post Co., 284 Mass. 160, 162, 187 N.E. 292, 293 (Mass. 1933); see also Restatement (Second) of Torts § 574 cmt. b (1977) (noting that "general charges of unchaste conduct" suffice to support defamation claim and that charges of "specific acts" are unnecessary).

_____

[10]Like the district court, 357 F. Supp. 2d at 373 n.5, we note that Stanton has claimed defamation based on allegedly false statement and therefore do not consider whether she could recover on a lesser showing.  See generally Shaari v. Harvard Student Agencies, Inc., 427 Mass. 129, 131-34, 691 N.E.2d 925, 927-29 (Mass. 1998).

Indeed, statements that are too vague to constitute defamation generally fall into the category of epithets, such as "communist," Nat'l Ass'n of Gov't Employees, 379 Mass. at 228-29, 396 N.E.2d at 1001-02, or "absolute barbarian, lunkhead, meathead, and nut," Fleming, 390 Mass. at 181-82, 454 N.E.2d at 100.  See generally Myers, 380 Mass. at 343, 403 N.E.2d at 380 (collecting cases rejecting defamation claims based on epithets).  Here, in contrast, Stanton has alleged that Metro defamed her by making a statement susceptible to the interpretation that she engages in sexually promiscuous behavior.  That statement is clear enough to support a defamation claim, particularly under the circumstances. See Restatement (Second) of Torts § 566 cmt. e (1977) ("Words uttered face to face during an altercation may well be understood merely as abuse or insult, while words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously.")[11]

Finally, Metro argues that Stanton's amended complaint should have been dismissed because she failed to "allege any facts

---

[11]We note in this regard that, in contrast to the circumstances here, the statement considered in Nat'l Ass'n of Gov't Employees was "used in the midst of a public debate" over a labor contract, "an occasion on which voices could be expected to be raised in sloganeering invective," 379 Mass. at 228-29, 396 N.E.2d at 1001, while those at issue in Fleming were spoken as part of a radio talk show host's on-air diatribe over his treatment at the hands of the defendant, which the host simultaneously acknowledged had made him "angry, likely to be biased, and that his listeners should take account of these facts."  390 Mass. at 179, 454 N.E.2d at 99.

-24-

that, if true, would demonstrate that Metro acted with negligent disregard for the truth by juxtaposing the photograph and the article." We disagree. "[P]rivate persons . . . may recover compensation (assuming proof of all other elements of a claim for defamation) on proof that the defendant was negligent in publishing defamatory words which reasonably could be interpreted to refer to the plaintiff." New England Tractor-Trailer, 395 Mass. at 477, 480 N.E.2d at 1009 (footnote omitted); see also Restatement (Second) of Torts §§ 564 cmt. f & 580B cmt. b(5) (1977). Furthermore, "'[i]f the recipient reasonably understood the communication to be made concerning the plaintiff, it may be inferred that the defamer was negligent in failing to realize that the communication would be so understood,'" provided the plaintiff can "'prove that a reasonable understanding on the part of the recipient that the communication referred to the plaintiff was one that the defamer was negligent in failing to anticipate.'" New England Tractor-Trailer, 395 Mass. at 478 n.5, 480 N.E.2d at 1010 n.5 (quoting Restatement (Second) of Torts § 564 cmt. f (1977)) (emphasis omitted).

Stanton alleges that "[t]he juxtaposition of [her] photograph with the text describing suburban teenage sexuality . . . has a reasonable tendency to injure [her] reputation and did so injure [her] reputation" in that it "insinuated that [she] was a person engaged in the activity described in the article . . . ." These allegations sufficiently state a defamation claim based on

-25-

the theory that Metro negligently used Stanton's photograph to illustrate a story describing teenagers as sexually promiscuous without realizing that the publication might therefore be reasonably understood to mean that she was sexually promiscuous.

## IV.

We close our analysis, as we opened it, with the observation that "'[a] complaint should not be dismissed unless it is apparent beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'" Greene, 398 F.3d at 48 (quoting Conley, 355 U.S. at 45-46). Based on our review of the amended complaint and the article in question, we conclude that this standard has not been met. We REVERSE the order of the district court insofar as it dismissed Stanton's defamation claim arising out of the juxtaposition of her photograph and the text of the article and REMAND the case for further proceedings consistent with this opinion.

SO ORDERED.