Dr. Evan S. DOBELLE, Plaintiff

v.

John ("Jack") FLYNN III, Individually, Kevin R. Queenin, Individually, Richard Freeland, Individually, Rubin & Rudman LLP, James B. Cox, Elizabeth D. Scheibel, Individually, and O'Connor & Drew, P.C., Defendants.

Civil Action No. 13–30177–KPN.

United States District Court, D. Massachusetts.

Signed April 9, 2014.

Daniel A. Schwartz, Jared S. Baumgart, Katherine Romel, Ross H. Garber, Sara J. Goldfarb, Shipman & Goodwin LLP, Hartford, CT, Darrell Mook, Donovan Hatem, LLP, Boston, MA, for Plaintiff.

Doris H. White, Attorney General's Office, Helene Kazanjian, Massachusetts Attorney General's Office, Jeffrey T. Collins, Office of the Attorney General, Michael J. Stone, Timothy M. Pomarole, Peabody & Arnold LLP, Jacqueline L. Allen, Michael J. Mascis, Law Offices of Jacqueline L. Allen, Boston, MA, for Defendants.

*MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS (Document Nos. 31, 33, and 34)*

KENNETH P. NEIMAN, United States Magistrate Judge.

Dr. Evan S. Dobelle ("Plaintiff") brings this action against the following individuals and entities connected directly or indirectly with Westfield State University ("WSU" or "University"): John ("Jack") Flynn III, Kevin R. Queenin, Richard Freeland, Rubin & Rudman LLP, James B. Cox, Elizabeth Scheibel, and O'Connor & Drew, P.C. (together, "Defendants"). The specific roles these defendants play in this action are described in detail below. In essence, Plaintiff alleges that he was constructively discharged from his position as President of WSU following an unwarranted and improper secret investigation into his use of University credit cards as well as undue outside pressure. More specifically, Plaintiff asserts the following claims in his amended complaint: tortious interference with a contract against all Defendants (Count I); violations of his First Amendment and Due Process rights pursuant to 42 U.S.C. § 1983 against Flynn, Freeland, Scheibel and Queenin (Count II); negligent misrepresentation against O'Connor & Drew, P.C. (Count III); defamation against Cox and Rubin & Rudman LLP (Count IV); and civil conspiracy against all Defendants (Count V). Among them, Defendants have filed three separate motions to dismiss.[1]

The parties have consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); Fed.R.Civ.P. 73. For the reasons which follow, the court will grant Defendants' motions in part and deny them in part. As a result of this ruling, Defendants Rubin & Rudman LLP, James B. Cox, and O'Connor & Drew, P.C., will be dismissed from the case and the remaining defendants—Flynn, Queenin, Freeland, and Scheibel ("State Defendants")—will answer to all counts against them except part of Count II. In effect, the case that will go forward against the State Defendants will center on Plaintiff's claim against them for tortious interference with his contractual relations, together with some constitutional overtones.

### I. STANDARD OF REVIEW

When faced with a Rule 12(b)(6) motion to dismiss for failure to state a claim, the

---

**1.** The University itself was named as a defendant in Plaintiff's original complaint but was dropped as a defendant when he amended his complaint. The court was informed at oral argument on the motions to dismiss that Plaintiff has since commenced a separate breach of contract action against the University in state court.

court must accept the allegations of the complaint as true, drawing all reasonable inferences in favor of the plaintiff. *See Albright v. Oliver*, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); *Coyne v. City of Somerville*, 972 F.2d 440, 443 (1st Cir.1992). Recently, the Supreme Court made clear that, under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), a complaint that states a plausible claim for relief, on its face, will a survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## II. BACKGROUND

The following facts come from Plaintiff's amended complaint and are stated in a light most favorable to him. *See Young v. Lepone*, 305 F.3d 1, 8 (1st Cir.2002). In December of 2007, WSU hired Plaintiff, who had extensive experience as a president of various colleges and universities, as President of the University and a Professor of Political Science. (Plaintiff's Amended Complaint ("Compl." ¶¶ 39–44, 49–50.)) Plaintiff and WSU entered into an employment agreement on December 21, 2007, which provided, in part, that the University "will bear any costs reasonably incurred by the President in connection with activities that pertain to the business" of the University, including "[a]ctivities undertaken for the purpose of . . . promoting support" for the University. (*Id.* ¶ 50–51; Exhibit A (attached to Compl.).) The contract did not authorize WSU to suspend Plaintiff, either with or without pay. (*Id.* ¶ 52.)

WSU immediately benefitted across a number fronts from Plaintiff's perform-ance as President. (*Id.* ¶¶ 54–69.) In particular, Plaintiff helped expand WSU's international focus and "organized several trips designed to create opportunities for international travel for students, implement international programs and exchanges, and attract foreign students." (*Id.* ¶¶ 57–59.) One of these trips was to Asia, which Plaintiff attended along with other individuals affiliated with WSU. (*Id.* ¶ 58.) The Westfield State Foundation ("Foundation"), a separate "tax-exempt 501(c)(3) organization that raises funds and manages charitable gifts in support of WSU activities" (*id.* ¶¶ 70–71), collaborated with Plaintiff in many of his efforts to strengthen the University, including the trip to Asia. (*Id.* ¶¶ 4, 58.)

In 2010, the Foundation's independent auditor determined that it was "at risk of facing a 'going concern' problem because (1) the Foundation used funds from donor-restricted accounts for purposes outside the scope of the donor restrictions and (2) because an understanding between the Foundation and the City of Westfield regarding the abatement of taxes for a Foundation property was invalid." (*Id.* ¶ 73.) The accounting issue was resolved, however, when WSU transferred funds to it. (*Id.* ¶ 74.) The decision to do so "was evaluated and sanctioned by a team of internal and external officials, including then-University Vice President of Administration and Finance Gerald W. Hays, then-Board Chair Queenin, the University's independent auditor, PriceWaterhouseCoopers, [Plaintiff], and University counsel Rubin & Rudman." (*Id.*)

Also in 2010, Plaintiff realized that his "practice of charging personal expenses incurred in connection with University travel to University credit cards, and subsequently reimbursing the University for those charges, was not proper procedure under then-applicable University policies."

(*Id.* ¶ 76.) Accordingly, in October of 2010, Plaintiff returned both his Foundation and University credit cards and reported his improper reimbursement practices to then-Chair of the WSU Board of Trustees, Kevin Queenin, and University legal counsel, Mark Peters, an attorney at Rubin & Rudman. (*Id.* ¶ 78.) Plaintiff asked Peters "whether he 'should lose sleep over this,'" and Peters responded that he should not. (*Id.* ¶ 79.)

Plaintiff and Queenin then "commissioned University counsel Rubin & Rudman to conduct a comprehensive review of 'credit card use, expense reimbursements and like transactions in connection with certain international travel.'" (*Id.* ¶ 80.) Rubin & Rudman found, in a November of 2011 report:

> (a) that there was "no evidence that any of the documented travel was for other than University purposes," (b) that "[Plaintiff's] reimbursement of the University for personal expenses appears generally to be made promptly after the [credit card] charge in question is identified," (c) that although University policy prohibits the use of a University-issued credit card for personal expenses, "I am informed that the University's policy . . . is not enforced with strict literalness," and (d) with respect to whether "any matter pertaining to the international travel . . . might be thought to constitute a violation" of [the State Ethics Statute], "I think there is none."

(*Id.* ¶ 82.) On November 28, 2011, counsel provided a copy of the report to Plaintiff and Queenin, who shared the information with John ("Jack") Flynn III, another member of the WSU Board of Trustees.

(*Id.* ¶ 83.) Queenin "did not consider, let alone implement, disciplinary action against [Plaintiff]." (*Id.* ¶ 86.)

On June 14, 2012, Flynn was named Chair of the WSU Board of Trustees. (*Id.* ¶ 93.) In early August of 2012, Flynn received a package of financial documents related to Plaintiff's travel and reimbursements from the then-Acting Vice President of Administration & Finance, who had received it from an unknown internal source. (*Id.* ¶¶ 95–96.) Rather than referring the matter to the Board—which Plaintiff alleges he was required to do by WSU by-laws—or even informing the Board, Flynn instead began his own investigation. (*Id.* ¶¶ 98–99, 101.) In September of 2012, Flynn called what Plaintiff describes as an "unauthorized" meeting of the Executive Committee of the WSU Board of Trustees, attended by Queenin, Elizabeth Scheibel (another member of the Board) and Peters, but not Plaintiff. (*Id.* ¶ 103.) At the meeting, it was decided that O'Connor & Drew P.C. ("O & D"), the University's auditors, "should be engaged to review the documents provided to Flynn to determine whether they would affect their findings as expressed in the annual audit of the University's finances." (*Id.* ¶ 103.) Neither Flynn nor Rubin & Rudman informed O & D of the prior review of similar issues in November of 2011. (*Id.* ¶ 105.) Moreover, Plaintiff alleges, O & D's review was undertaken even though "there was no evidence of fraud, or even suspicious behavior, identified in the annual audits conducted during [Plaintiff's] tenure, at least two of which were conducted by O & D." (*Id.* ¶ 106.) [2]

---

**2.** Plaintiff alleges that holding this meeting violated WSU by-laws and Massachusetts state law, which require that any meeting of the Board or its Executive Committee be properly noticed and open to the public. (*Id.* ¶ 102.) Plaintiff also alleges that, by failing to notify Plaintiff of the substance of the meeting, Flynn violated a WSU by-law that requires the Chair to "coordinate all board communications, written or oral, with the president." (*Id.* ¶ 104.) In addition, Plaintiff alleges that the Executive Committee may

On October 22, 2012, an engagement letter with O & D was executed, which estimated that its review should be completed within three weeks. (*Id.* ¶¶ 122–23.) On December 3, 2012, Flynn received from O & D an initial draft report, which he shared with the Executive Committee, including Queenin and Scheibel, but not the full Board. (*Id.* ¶ 128.) Three days later, the Executive Committee held a secret meeting, along with Peters, to expand the scope of O & D's review. (*Id.* ¶ 129.)[3]

On December 13, 2012, at a Board of Trustees meeting, Flynn reported that O & D "was reviewing documents to determine 'if they are in compliance'" but stated "that he felt the documents 'won't amount to much.'" (*Id.* ¶ 132.) Five days later, O & D, Flynn, and Robert Johnson, the then-Chair of the Foundation, signed a new engagement letter in which O & D confirmed that it "shall report directly to John F. Flynn," not to the Board. (*Id.* ¶¶ 134–35.) Flynn later acknowledged, at an August 29, 2013 meeting of the Board, that the decision to enter into the December 18th engagement letter was not ratified by the Board. (*Id.* ¶ 136.)

On January 24, 2013, O & D provided a second draft of the report to Flynn, who kept it secret from the Board. (*Id.* ¶ 137.) On March 27, 2013, O & D provided a third draft to Flynn, who again kept it secret from the Board. (*Id.* ¶ 138.) However, in the first few months of 2013, Flynn provided a version of the draft report to Plaintiff. (*Id.* ¶ 139.) Plaintiff

"was shocked and outraged by the content and unwarranted conclusions in the Report." (*Id.* ¶ 140.) He then consulted with James B. Cox, an attorney at Rubin & Rudman, who "was also critical of O & D's work, opining that the March draft report was not a 'professional product' due to the use of 'syntax, . . . cliches and unnecessary opinion.'" (*Id.* ¶ 141.) Cox told Plaintiff "that he 'encouraged' O & D to 'correct all of these things'" and said that he would work with O & D "to create a more accurate and professional report." (*Id.* ¶ 142.) Plaintiff "repeatedly offered to meet with O & D to answer any questions they might have about the purpose of expenditures, but O & D routinely declined, stating that they found [Plaintiff] intimidating." (*Id.* ¶ 143.) As a result, Plaintiff alleges, "O & D's report suffered from a number of glaring deficiencies and inaccuracies. For instance, a draft report indicated that the accountants were 'unsure as to the general mission of the Foundation,' a critical piece of information that [Plaintiff] could have provided." (*Id.* ¶ 144.) Flynn later acknowledged at the August 29, 2013 meeting of the Board that none of the actions related to O & D's engagement were presented for ratification at the Board's April meeting. (*Id.* ¶ 146.)

At some point, Plaintiff alleges, Flynn leaked information regarding Plaintiff's University credit card use to the media. (*Id.* ¶ 147.) As a result, WSU began receiving public records requests from multiple media outlets in the Spring of 2013. (*Id.* ¶ 148.) Plaintiff further alleges that

---

only act on matters independently of the Board in cases of "emergency," this matter did not constitute an emergency, and, even if it did, no Executive Committee member presented the actions taken at the meeting for ratification by the full Board at its next meeting, as required by WSU by-laws in cases of emergency. (*Id.* ¶¶ 109–110, 112.) Accordingly, Plaintiff alleges, the Executive Committee members did not have the authority to act

on behalf of the Board or the University. (*Id.* ¶¶ 108, 111.)

**3.** Again, Plaintiff alleges that, because the meeting was not noticed and a substantive decision was reached without presenting it to or obtaining approval from the Board, the meeting violated Massachusetts Open Meeting laws and WSU by-laws. (*Id.* ¶ 131.)

"[t]he leaks and ensuing media spectacle resulted in the dissemination of numerous inaccuracies regarding [Plaintiff] and his activities as WSU president." (*Id.* ¶ 149.)

On July 11, 2013, WSU received a document request from the Massachusetts Inspector General ("IG") for all work products related to reviews of expenditure or financial activities of Plaintiff and his office. (*Id.* ¶ 150.) Only as a result of this request, Plaintiff alleges, was the Board finally advised of O & D's engagement and provided copies of its draft reports on July 30, 2013. (*Id.* ¶¶ 151–52.) Also on July 30, 2013, O & D provided an updated copy of the report to Flynn and Cox, but Cox did not circulate this draft to the Board. (*Id.* ¶¶ 153–54.)

On August 29, 2013, the Board held a Special Meeting to discuss the findings of the reports. (*Id.* ¶ 156.) After O & D gave a presentation of its findings, "several Trustees voiced concerns regarding the various procedural and statutory violations that culminated in the subject reports." (*Id.* ¶ 157.) Flynn acknowledged the violations but, Plaintiff asserts, "no meaningful discussion was had or resolution reached as to what should be done, if anything, to remedy these violations." (*Id.* ¶ 158.) Plaintiff responded to specific items raised by O & D and to all questions posed by the Board, and several Trustees spoke out in strong support of Plaintiff, some expressing regret that the "whole story" was not being shared with the public. (*Id.* ¶¶ 159, 161.) Still, Flynn moved to place a temporary moratorium on all presidential travel involving airfare or overnight lodging, but the motion failed overwhelmingly. (*Id.* ¶ 162.) The Board did pass, however, a unanimous motion to postpone action on the items raised in the O & D report until its regular October meeting, so as to provide the IG with time to finalize its review. (*Id.* ¶ 163.)

Plaintiff alleges that additional leaks from within WSU—as well as "misleading characterizations made by University counsel Cox and Board Members Flynn, Queenin and Scheibel" at a September 20, 2013 public meeting with the Commissioner of Higher Education, Richard Freeland, and the Secretary of Education, Matthew Mallone—"fueled" a "media firestorm," which "scorched [Plaintiff's] character in the court of public opinion." (*Id.* ¶ 169.) Specifically, one of the questions raised by the state officials at the meeting—which was also attended by members of the media—was a request for an explanation as to the transfer of funds from WSU to the Foundation in 2010. (*Id.* ¶¶ 242–45.) "Cox responded to that request," Plaintiff alleges, "by indicating that [Plaintiff] unilaterally authorized that transfer pursuant to his purported authority to expend up to $500,000 without approval from the Board." (*Id.* ¶ 246.) Cox, however, "concealed" the involvement of other WSU administrators, members of the WSU Board, his law firm, and WSU's independent auditor in the transfer decision. (*Id.* ¶ 247.)

Later that day, the Boston Globe published an article about the meeting. (*Id.* ¶ 248.) The article reported that state officials were alarmed about the $400,000 transfer of funds from WSU to the foundation in 2010, that Flynn did not have an answer to Freeland's question as to how the transfer occurred, but that "[a] Westfield staff member"—whom Plaintiff alleges was Cox—"explained that [Plaintiff] had authority to spend up to $500,000 without board approval." (*Id.* ¶ 248, 250.) Plaintiff alleges that Cox's statements were false and, furthermore, that Cox knew the truth when he made the statements, especially because he had been working at the time on an explanation to a separate inquiry regarding past transfers of public funds to the Foundation. (*Id.* ¶¶ 251–52.)

Plaintiff further alleges that "[t]he false statements were made to avoid potentially embarrassing admissions that would have diminished Rubin & Rudman's stature in the community." (*Id.* ¶ 255.) On September 25, 2013, counsel for Plaintiff wrote to Cox demanding that he retract the statements and correct them in the press, but neither Cox nor Rubin & Rudman did so. (*Id.* ¶¶ 256–57.)

Also on September 25, 2013, Plaintiff, through counsel, wrote a letter to Thomas Frongillo of Fish & Richardson, counsel for WSU and the Board. (*Id.* ¶ 164.) Plaintiff asserts that

> [t]he letter reiterated the pattern of misconduct engaged in by WSU, members of the Board, and certain outside firms engaged by WSU. Specifically, the letter officially documented, as [Plaintiff] had done informally before, the repeated violations of University by-laws, violations of Massachusetts' Open Meeting laws, waste in the expenditure of public funds, defamatory remarks, and tortious interference with WSU's contractual relations with [Plaintiff].

(*Id.* ¶ 165.) In addition, Plaintiff alleges, the letter suggested several remedial measures to address both the specific misconduct described therein "and the more general problem of the Board's repeated disregard for the basic procedural safeguards required by the by-laws and Massachusetts law," but no remedial action was taken. (*Id.* ¶ 167.) Plaintiff now alleges that WSU was required to send a copy of the letter to the Massachusetts Attorney General along with an explanation of any remedial action taken, but that

WSU failed to do so. (*Id.* ¶ 166.)[4] Plaintiff further alleges that "[a]s a result of the letter, Defendants increased their retaliatory efforts against [Plaintiff] in their ultimately successful effort to remove him from office." (*Id.* ¶ 168.)

Meanwhile, Plaintiff alleges, Freeland "publicly browbeat[ed] the Board to take action against [him], using the press as his bullhorn," including sending "an open letter to [Plaintiff] on September 25, 2013, in which he snidely demanded answers to a dozen questions related to the O & D reports, as well as a detailed accounting of every trip identified in the reports." (*Id.* ¶ 171.) Freeland, Plaintiff asserts, gave him one week to provide responses and explained that, in the "absence of a satisfactory response," he would "assume that the findings" in the report were true and would "take appropriate action." (*Id.* ¶¶ 172, 174.) Freeland also explained that he had "initiated a review of potential future WSU allocations and grant disbursements." (*Id.* ¶ 173.) When Plaintiff failed to provide the response on time—after requesting a two-business-day extension which Freeland denied—Freeland "announced to the press that he was, effective immediately, withholding over $2 million in critical funding from WSU." (*Id.* ¶¶ 176–77.) Plaintiff alleges that "Freeland's actions were done for the sole purpose of encouraging and demanding that the WSU Board breach its contract with [Plaintiff]." (*Id.* ¶ 178.) Two business days after Freeland's deadline, Plaintiff submitted detailed responses to the questions as well as documentation. (*Id.* ¶ 180.)

Thereafter, Plaintiff alleges, Freeland sent an open letter to the Board "lam-

---

4. In his amended complaint, Plaintiff asserts that this requirement is contained in Massachusetts General Laws Chapter 149. (*Id.* ¶¶ 164, 166.) At the hearing on Defendants' motions, however, Plaintiff's counsel could not provide the specific citation within that

chapter. Subsequently, Plaintiff's counsel informed the court that the requirement is actually contained in Massachusetts General Laws Chapter 30A, § 23(b). (*See* Document No. 46.)

bast[ing]" Plaintiff and stating that his actions were, "at worst, intentional conduct and, at best, ineffective leadership." (*Id.* ¶ 181.) Freeland also stated that, in his opinion, "interviews and further research are not necessary." (*Id.* ¶ 182.) Lastly, Freeland noted that only the Board had the authority to remove Plaintiff from his position as president but explained that "as long as these issues remain unaddressed, discretionary funding ... remains suspended." (*Id.* ¶ 184.) Plaintiff alleges that, in response to this "threat," which was reported in the media, the Board promptly scheduled a Special Meeting for October 16, 2013 at Queenin's request to determine whether to suspend him. (*Id.* ¶ 185.) Freeland also indicated, via the media, that he would be attending the Special Meeting. (*Id.* ¶ 186.)

At the Special Meeting on October 16, 2013, Plaintiff "offered to resign from his position as President in order to permit the University to move forward, unimpeded by the media's scrutiny and incessant unflattering coverage, Flynn's unrelenting campaign to scrutinize historical practices, and Freeland's insatiable desire to oust [Plaintiff]." (*Id.* ¶ 187.) During the executive session of the meeting, and while Plaintiff was asked to step out, Flynn contacted Freeland's office (Freeland having not attended the meeting) to discuss the proposed resignation, whereupon Flynn was told that Plaintiff "would not be permitted to resign and that any outcome other than [his] termination would not be acceptable." (*Id.* ¶ 188.) Led by Flynn, Queenin, and Scheibel, the Board then voted to place Plaintiff on administrative leave. (*Id.* ¶ 190.) The Board also ordered Plaintiff to turn in his University-issued cell phone, computer, and vehicle—all of which he says was provided by contract—and ordered him not to communicate with University personnel. (*Id.*) The Board also voted to engage Fish & Rich-

ardson LLP to investigate Plaintiff's expenditures and "leadership." (*Id.* ¶ 191.) Shortly thereafter, Plaintiff asserts, "Freeland praised Flynn and the Board for their actions and then provided a financial reward, unfreezing nearly $200,000 in funds"; Freeland, however, did not yet unfreeze the $2 million in funding. (*Id.* ¶ 192.)

Plaintiff alleges that "based on the aforementioned conduct, [he] reasonably concluded that his termination was a forgone conclusion and there was no meaningful way for him to continue his employment." (*Id.* ¶ 193.) Accordingly, he notified WSU on November 8, 2013, that he resigned as WSU president. (*Id.* ¶ 194.) Plaintiff further alleges that his

constructive termination was forced upon him by the hostile working environment created by Defendants, who had, among other things, subjected him to multiple unwarranted investigations, violated university by-laws and Massachusetts Open Meeting laws on numerous occasions, violated his due process rights, stripped him of the benefits and responsibilities to which he was entitled by contract, and placed him on administrative leave—stripping him of any professional duties—in violation of his contract.

(*Id.* ¶ 195.) In addition, according to Plaintiff, "[t]he Board's actions constituted a material change in [his] duties and a significant reduction in his rank." (*Id.* ¶ 196.)

Plaintiff's complaint continues: on November 13, 2013, "having accomplished his goal of removing [Plaintiff] as WSU president," Freeland released the $2 million in funding that had been frozen. (*Id.* ¶ 197.) On November 25, 2013, the Board concluded in executive session that Plaintiff's departure had "obviated the need" for Fish

& Richardson to finish its report. (*Id.* ¶ 199.) The law firm, however, billed WSU more than $500,000 for work performed in September and October of 2013 regarding its report and other matter related to Plaintiff. (*Id.* ¶ 201.) Also at the November 25th meeting, O & D presented its audit findings for the 2013 fiscal year, which audit was more comprehensive than in years past. (*Id.* ¶ 203.) "Despite the elevated auditing standards," Plaintiff alleges, "O & D did not discover any evidence of fraudulent activity, nor did they discovery any material weaknesses or significant deficiencies." (*Id.* ¶ 204.)

### III. *Discussion*

A. *Constitutional Claims under 42 U.S.C. § 1983*

As this is a non-diversity case and the court's jurisdiction under 28 U.S.C. § 1331 is predicated on Plaintiff's constitutional claims pursuant to 42 U.S.C. § 1983, the court will first address the arguments advanced by the State Defendants that Count II should be dismissed.[5] Within this count, Plaintiff appears to assert four separate claims: (1) First Amendment retaliation; (2) violation of Plaintiff's procedural due process rights for depriving him of a protected property interest (his employment); (3) a "stigma-plus" procedural due process claim for depriving Plaintiff of his liberty interest in his reputation in connection with the loss of his employment; and (4) violation of Plaintiff's substantive due process rights for depriving him of a protected property interest. The court will address each claim in turn.

### 1. *First Amendment Retaliation*

The State Defendants argue that Plaintiff's First Amendment claim should be

dismissed because it is asserted only in a conclusory fashion and solely for the purpose of obtaining jurisdiction. In response, Plaintiff argues that the amended complaint adequately alleges First Amendment retaliation in connection with the "whistleblower" letter he sent on September 25, 2013. Plaintiff, in the court's opinion, has somewhat the better argument.

 "In order to succeed on a First Amendment retaliation claim, a party must show that [his] conduct was constitutionally protected, and that this conduct was a substantial factor [or] ... a motivating factor driving the allegedly retaliatory decision." *Air Sunshine, Inc. v. Carl,* 663 F.3d 27, 35–36 (1st Cir.2011) (quoting *Gorelik v. Costin,* 605 F.3d 118, 123 (1st Cir.2010)). The first element, in turn, has two sub-parts: first, "the speech at issue [must] involve[ ] matters of public concern." *Guilloty Perez v. Pierluisi,* 339 F.3d 43, 51 (1st Cir.2003) (quoting *Mullin v. Town of Fairhaven,* 284 F.3d 31, 37 (1st Cir.2002)). "If an employee speaks out only on a matter of personal interest, the First Amendment value of his words is low, and 'absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Id.* (quoting *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). Second, "[i]f the court concludes that the employee did speak out on a matter of public concern, ... the court [must] 'balance the strength of plaintiffs' and the public's First Amendment interests against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or

---

**5.** The State Defendants make no distinction amongst the four of them regarding the claims against them or the arguments they pursue. Accordingly, for present purposes they proceed as one.

entity must provide through' its employees." *Id.* (quoting *Mullin,* 284 F.3d at 37).

■ Contrary to the State Defendants' argument, Plaintiff did not assert his First Amendment claim in a merely conclusive manner. Rather, he adequately laid out the basis for this claim, both in the Facts section of his complaint and within Count II itself, so as to provide sufficient notice to the State Defendants. *See Carter v. Newland,* 441 F.Supp.2d 208, 214 (D.Mass. 2006) ("The critical requirement of Rule 8 is that the plaintiff's complaint give the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.") (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). To be sure, the State Defendants are correct that the court ought not credit "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Thus, for example, Plaintiff's allegation that, "[a]s a result of the [September 25, 2013] letter, Defendants increased their retaliatory efforts against [him] in their ultimately successful effort to remove him from office," is not entitled to the presumption of truth normally accorded factual allegations. Nonetheless, Plaintiff's other allegations—namely, that he sent a letter detailing various misconduct and that thereafter tensions between him and the Board rose significantly— provide sufficient facts to state a claim for relief.[6]

Granted, the State Defendants also argued at the hearing (although not in their brief) that Plaintiff's speech is not entitled to First Amendment protection because

the September 25, 2013 letter (a) only pertained to a matter of personal interest rather than a matter of public concern, (b) was sent from his counsel rather than Plaintiff personally, and (c) was sent to the Board's counsel rather than the Board itself or the community at large. These arguments, however, are undeveloped, thereby compromising the court's ability to address the issues. Still, the court makes the following three points with regard to these belated arguments.

First, the court does not have a copy of the September 25, 2013 letter; it was not attached as an exhibit to either Plaintiff's complaint or the State Defendants' motion. As a result, the court cannot fully analyze the "content, form, and context" of the "speech" at issue. *Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684 ("Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."); *Curran v. Cousins,* 509 F.3d 36, 46 (1st Cir.2007) ("Whether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry."). As a result, the court has been left to rely on the description of the letter in Plaintiff's amended complaint. *See, e.g., Vickowski v. Hukowicz,* 201 F.Supp.2d 195, 208 (D.Mass.2002) (recognizing that the court had opined, at the motion to dismiss stage, that the speech appeared to constitute a matter of public concern because the court "considered only the description of the [speech] as set forth in Plaintiff's original complaint," which "highlighted the alleged constitutional aspects of the [speech] over its more personal components," but that

---

**6.** The court notes that while the State Defendants argue, generally, that Plaintiff has only pled conclusory statements, they have not argued that, on the basis of the facts alleged, Plaintiff's claim fails at the *Pickering* balancing stage or that the letter was not a sub-

stantial or motivating factor in any adverse employment action. Nor have the State Defendants argued that they are protected by qualified immunity. Accordingly, the court does not address these issues.

after discovery was completed it became clear that the speech "dealt with only private issues and did not touch upon matters of public concern").

Second, although it appears from Plaintiff description of the letter that, in large part, he was concerned with his personal interests, the letter, according to the complaint, also explicitly mentions taxpayer "waste." That topic, on the surface at least, pertains to a matter of public concern. *See Guilloty Perez*, 339 F.3d at 52 ("Guilloty's frustrations with the conduct of his fellow agents and his supervisor ... went beyond mere concerns over the internal working conditions of the department."); *see also Davignon v. Hodgson*, 524 F.3d 91, 102 (1st Cir.2008) ("[A]lthough it would be naive to think that the plaintiffs in this case were moved to speak solely by the spirit of civic-mindedness, our cases do not mandate selflessness on the part of plaintiffs.").[7]

Third, the fact that the letter was sent by Plaintiff's attorney to the Board's attorney does not change the court's conclusion that Plaintiff himself has plausibly set forth a First Amendment claim. For one thing, Plaintiff alleges that the letter was sent by his counsel *on behalf of* himself; that is sufficient to make the speech Plaintiff's. *See, e.g., Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir.2009) ("Because Gera-

gos spoke on Eng's behalf in his capacity as Eng's lawyer, his words were Eng's words as far as the First Amendment is concerned. Eng himself therefore had a personal First Amendment interest in Geragos's speech."). For another, "the decision to disclose his allegations to the Board" (through its attorney), "rather than the community at large, did not eliminate [Plaintiff's] First Amendment interest in speaking out." *O'Connor*, 994 F.2d at 916 (citing *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) ("Neither the Amendment itself nor our decisions indicate that [the right to speak out is] lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.")).

Of course, these factors may play a role later in the litigation. For now, however, it is too early to conclude that Plaintiff's speech was unprotected. Accordingly, the court will deny the State Defendants' motion to the extent it seeks dismissal of Plaintiff's First Amendment retaliation claim.

### 2. Deprivation of Property Interest without Procedural Due Process

The State Defendants next argue that Plaintiff's procedural due process claim

---

**7.** Again, however, because the court has not reviewed the precise content of the letter, it cannot determine whether the speech implicates a matter of *inherent* public concern which would preclude inquiry into Plaintiff's motives. *See O'Connor v. Steeves*, 994 F.2d 905, 913–14 (1st Cir.1993) ("Where a public employee speaks out on a topic which is clearly a legitimate matter of *inherent* concern to the electorate, the court may eschew further inquiry into the employee's motives as revealed by the 'form and context' of the expression.... On the other hand, public-employee speech on a topic which would not necessarily qualify, *on the basis of its content*

*alone*, as a matter of inherent public concern (*e.g.*, internal working conditions, affecting only the speaker and co-workers), may require a more complete *Connick* analysis into the form and context of the public-employee expression, 'as revealed by the whole record,' ... with a view to whether the community has *in fact* manifested a legitimate concern in the internal workings of the particular agency or department of government, and, if so, whether the 'form' of the employee's expression suggests a subjective intent to contribute to any such public discourse." (emphasis in the original; internal citations omitted)).

fails because his placement on administrative leave and subsequent voluntary resignation did not constitute a property deprivation. Plaintiff argues in response that he has sufficiently alleged deprivation of a protected property interest—his contractual employment—and that the State Defendants constructively terminated him without due process. Here, too, Plaintiff has the better argument, at least for present purposes.

■■■ "To state a valid procedural due process claim, a plaintiff must (1) 'identify a protected liberty or property interest,' and (2) 'allege that the defendants ... deprived [him] of that interest without constitutionally adequate process.'" *Air Sunshine, Inc.*, 663 F.3d at 34 (quoting *Gonzalez–Droz v. Gonzalez–Colon*, 660 F.3d 1, 3 (1st Cir.2011)). Plaintiff's allegations easily satisfy the first prong. As Plaintiff explains, he had a reasonable and constitutionally protected expectation of continued employment in light of his employment contract, which provided that he could only be dismissed for cause unless the Board gave him written notice twelve months in advance. (See Exhibit A (attached to Compl.).) *See King v. Town of Hanover*, 116 F.3d 965, 969 (1st Cir.1997) ("It is well established that a public employee has a constitutionally protected property interest in his continued employment when he reasonably expects that his employment will continue.... An employee who can only be dismissed for cause has such an expectation." (citation omitted)).

■■■ Still, "that leaves the more difficult question [at the second prong] whether [plaintiff] was 'deprived' of that interest by

some form of state action." *Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172–73 (4th Cir.1988). As the Fourth Circuit explained in *Stone*, cited by the First Circuit in *Walker v. Waltham Housing Authority*, 44 F.3d 1042, 1047 (1st Cir.1995), *see also Monahan v. Romney*, 625 F.3d 42, 47 n. 4 (1st Cir.2010), that "deprivation" may be compromised if Plaintiff left of his own accord:

> Had he been officially discharged from his public employment, the answer would be evident. But [plaintiff's] superiors never officially 'fired' him—he resigned. If he resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause.... If, on the other hand, [plaintiff's] 'resignation' was so involuntary that it amounted to a constructive discharge, it must be considered a deprivation by state action triggering the protections of the due process clause. A public employer obviously cannot avoid its constitutional obligation to provide due process by the simple expedient of forcing involuntary 'resignations.' The proper focus of the constitutional inquiry here is therefore on the voluntariness of [plaintiff's] resignation.

*Stone*, 855 F.2d at 173 (citation omitted).[8]

■■■ Pursuant to these standards, "[t]he basic approach ... is the obvious one of looking to the circumstances of the resignation to determine whether the employee was denied the opportunity to make

8. Moreover, as the State Defendants point out, a suspension with pay normally will not constitute a property deprivation. *See, e.g., Cronin v. Town of Amesbury*, 895 F.Supp. 375, 386 (D.Mass.1995) (citing *Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 544–45, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)). Indeed, Plaintiff does not argue that his placement on administrative leave, by itself, deprived him of a property interest; instead, he rests his claim on having been constructively discharged.

a free choice." *Id.* at 174; *see also Lee–Crespo v. Schering–Plough Del Caribe Inc.,* 354 F.3d 34, 45 (1st Cir.2003) (stating, regarding a Title VII claim, that "[t]o prove constructive discharge, a plaintiff must usually show that her working conditions were so difficult or unpleasant that a reasonable person in [her] shoes would have felt compelled to resign" (internal quotation marks omitted)); *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 561 (1st Cir.1986) (same standard regarding Age Discrimination in Employment Act claim). Here, in the court's opinion, Plaintiff has adequately alleged constructive discharge so as to satisfy the "deprivation" requirement.

This is not to say that the facts alleged by Plaintiff in his complaint paint a particularly vivid constructive discharge picture, *i.e.,* working conditions so intolerable that he lacked a free choice and reasonably felt compelled to resign. Indeed, the allegations reveal that Plaintiff actually offered to resign, an offer that was originally rejected, all while being represented by counsel. Thus, these facts suggest that Plaintiff "*had a choice.* [He] could stand pat and fight." *Stone,* 855 F.2d at 174 (quoting *Christie v. United States,* 518 F.2d 584, 587 (Ct.Cl.1975) (emphasis in original)). Nonetheless, the court concludes that Plaintiff's complaint, read as a whole and in a light most favorable to him, raises a plausible inference of a constructive discharge. *See Ocasio–Hernandez v. Fortuno–Burset,* 640 F.3d 1, 12–13 (1st Cir.2011) ("Nor may a court attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if ... a recovery is very remote and unlikely.' ") (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955).

In reaching this conclusion, the court offers two further observations. First, whether an employee has been constructively discharged is generally determined by a highly fact-driven test and, thus, is often more appropriately decided at summary judgment. *See Stone,* 855 F.2d at 173–78. In one particular case, for example, the Seventh Circuit upheld the denial of a motion to dismiss (because the plaintiff sufficiently alleged a constructive discharge in support of his due process claim) but subsequently affirmed summary judgment in favor of the defendants because the undisputed facts, fleshed out during discovery, failed to demonstrate a constructive discharge. *Compare Levenstein v. Salafsky,* 164 F.3d 345 (7th Cir.1998), *with Levenstein v. Salafsky,* 414 F.3d 767 (7th Cir.2005).

Second, the State Defendants overstate Plaintiff's burden under the *Twombly* and *Iqbal* plausibility standard. While this standard is certainly more onerous than previous notice pleading, the Supreme Court went out of its way in *Twombly* to explain that its approach was not inconsistent with *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), in that it was not requiring "heightened" pleading of "specific" or "particularized" facts. *Twombly,* 550 U.S. at 569 n. 14 & 570, 127 S.Ct. 1955; *see also Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations' ...."). In fact, the First Circuit has repeatedly reiterated that "plaintiffs need not plead facts in the complaint that establish a prima facie case ... nor must they allege every fact necessary to win at trial." *Garayalde–Rijos v. Municipality of Carolina,* 747 F.3d 15, 24, 2014 WL 1270607, at \*7 (1st Cir. March 28, 2014) (internal quotation marks omitted). "The prima facie standard is an evidentiary standard, not a pleading standard, and there is no need to set forth a detailed evidentiary proffer in a complaint." *Rodriguez–Reyes v. Molina–Rodriguez,* 711 F.3d 49, 54 (1st

Cir.2013); *see also Ocasio–Hernandez v. Fortuno–Burset,* 640 F.3d 1, 14 (1st Cir. 2011) ("[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." (internal quotation marks omitted)). Instead, "[t]he relevant question ... in assessing plausibility is not whether the complaint makes any particular factual allegation but, rather, whether 'the complaint warrant[s] dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.'" *Rodriguez–Reyes,* 711 F.3d at 55 (quoting *Twombly,* 550 U.S. at 569 n. 14, 127 S.Ct. 1955).

With this guidance in mind, it is clear that dismissal on grounds that Plaintiff voluntarily resigned is, in the least, premature. Plaintiff's complaint adequately alleges that the State Defendants mounted months of unwarranted, secret, and improper investigations into practices for which he had already been cleared, that pressure from the Board and state officials continued to build, and that as of October 16, 2013, the Board commissioned yet another investigation not only into Plaintiff's expenditures but his overall "leadership" as well, all of which culminated in his being placed on administrative leave. In Plaintiff's exposition of the facts, that caused him not only to lose his position and incidental perks but resulted in his being prohibited from contacting WSU personnel. *Cf. Parrett v. City of Connersville,* 737 F.2d 690, 694 (7th Cir.1984) (relegation of chief detective to a storage closet with no work found to constitute a constructive discharge and, thus, a property deprivation). Moreover, Plaintiff's unaccepted offer to resign came before his suspension and, thus, may have been sufficiently attenuated from his eventual resignation as to not preclude a finding of constructive discharge. Further, Plaintiff alleges, the reason his first resignation offer was not accepted was because Freeland made it clear to the Board that nothing short of his complete termination would suffice, thus plausibly suggesting circumstances rising to the level of a constructive discharge.

Accordingly, the court will deny the State Defendants' motion to the extent it targets Plaintiff's procedural due process property interest claim.

### 3. *Substantive Due Process*

The State Defendants also argue that Plaintiff's substantive due process claim should be dismissed because the facts alleged are not sufficiently egregious as to "shock the conscience." Plaintiff's argument to the contrary, the court agrees with the State Defendants.

 Substantive due process "claims are limited to government action that, by its very nature, shock[s] the conscience ... and [are] reserve[d] ... for truly horrendous situations." *Freeman v. Town of Hudson,* 714 F.3d 29, 40 (1st Cir.2013) (citation omitted; internal quotation marks omitted). Although Plaintiff's allegations, if true, are serious, the court cannot conclude that they plausibly present the kind of egregious situation upon which a substantive due process claim may rest. *See Harron v. Town of Franklin,* 660 F.3d 531, 536 (1st Cir.2011) ("[T]he test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.") (quoting *Gonzalez–Fuentes v. Molina,* 607 F.3d 864, 881 (1st Cir.2010)).

 To be sure, Plaintiff argues that the facts here are similar to those in *Bliss v. Sanguinet,* 2013 WL 3334728 (D.Mass. June 24, 2013). But even in *Bliss,* where

the court held that the plaintiff "barely" "clear[ed] the hurdle," *id.* at *5, the facts were far more egregious. The plaintiff there alleged that, following his promotion within the police department over another candidate, members of the Board of Selectmen targeted him by bringing false charges of misconduct due to their personal relationship with the unsuccessful candidate, going as far as granting a town resident's unrelated request for a cease and desist order in exchange for her agreement to concoct false allegations against the plaintiff. *Id.* at *1–3. The allegations in the case at bar are simply not of the same ilk. For example, while Plaintiff labels Freeland's withholding of funds from WSU as a *quid pro quo* arrangement, it strains credulity to conclude that such conduct is comparable to trading a cease and desist order for false testimony so as to enact personal retribution. Accordingly, the court will grant the State Defendants' motion to the extent it seeks dismissal of Plaintiff's substantive due process claim.

### 4. *"Stigma–Plus" Liberty Deprivation*

Finally, the State Defendants argue that Plaintiff cannot prevail on his "stigma-plus" claim because neither reputational damages alone nor damage to "future employment prospects" constitute deprivation of liberty. In response, Plaintiff argues that he is asserting a "stigma-plus" *procedural* due process claim, not a *substantive* one as the State Defendants would have it, and that he has adequately alleged facts in support of that claim, namely, that he was repeatedly and falsely accused of misconduct in connection with the denial of a right or status previously recognized under state law. Again, the court concludes for present purposes that Plaintiff has the better argument.

 "Damage to one's reputation is not 'by itself sufficient to invoke the proce-

dural protection of the Due Process Clause,' although loss of reputation, coupled with some other tangible elements, may rise to the level of a protected liberty interest." *Cronin v. Town of Amesbury,* 895 F.Supp. 375, 383 (D.Mass.1995) (quoting *Paul v. Davis,* 424 U.S. 693, 701, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976)). The following standard for such "stigma-plus" claims applies: "To establish a liberty interest sufficient to implicate fourteenth amendment safeguards, the individual must be not only stigmatized but also stigmatized in connection with a denial of a right or status previous recognized under state law." *Rodriguez de Quinonez v. Perez,* 596 F.2d 486, 489 (1st Cir.1979) (quoting *Dennis v. S & S Consolidated Rural High School Dist.,* 577 F.2d 338, 341 (5th Cir.1978)).

 Since Plaintiff has adequately alleged that he was constructively discharged, the court concludes that he has also stated a "stigma plus" claim in connection with such discharge. *See id.* at 490 ("[R]emoval from bank director status, as it is recognized by Puerto Rico law, on the grounds of dishonesty, actual or suspected, affects a liberty interest requiring due process safeguards."). The "stigma-plus" standard is, of course, less severe than the shock-the-conscience standard. Plaintiff is not merely asserting damage to his reputation or future employment prospects but, instead, alleges that the State Defendants stigmatized him "incident to" the deprivation of his property interest in his employment. *See Mead v. Independence Ass'n,* 684 F.3d 226, 233 (1st Cir. 2012). Simply put, Plaintiff's "stigma plus" claim is not subject to dismissal on the grounds asserted by the State Defendants and, accordingly, the court will deny that portion of their motion.

## B. State Law Claims

Since the court has determined that at least part of Plaintiff's constitutional claim in Count II survives, its jurisdiction over the State Defendants is proper. Accordingly, the court will proceed to assess the state law claims, the adequacy of which is also challenged by the State Defendants and the other defendants as well.[9]

### 1. Immunity under M.G.L. c. 258, § 2

The State Defendants argue that they are immune from the state law claims against them—Count I (tortious interference with contractual relations) and Count V (civil conspiracy)—under M.G.L. c. 258, § 2 of the Massachusetts Tort Claims Act ("MTCA"). Section 2 of the MTCA provides that a public employee shall not be liable "for any injury or loss of property or personal injury or death caused by his negligent or wrongful act or omission while acting within the scope of his office or employment." MASS. GEN. LAWS ch. 258, § 2. The State Defendants raise no other grounds upon which Counts I and V should be dismissed.

■■ As Plaintiff points out, both the state law claim of tortious interference with a contract and the state law conspiracy claim are intentional torts for which

M.G.L. c. 258, § 2 provides no immunity. This is made clear both by the statute itself, see M.G.L. c. 258, § 10(c) (section 2 does not apply to "any claim arising out of an intentional tort, including assault, battery, false imprisonment, false arrest, intentional mental distress, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or interference with contractual relations" (emphasis added)), and applicable case law, see Wentworth Precious Metals, LLC v. City of Everett, 2013 WL 441094, at *14 (D.Mass. Feb. 4, 2013) (although M.G.L. c. 258, § 10(c) "does not specifically enumerate conspiracy, [it] still contemplates such claims 'by the language of § 10(c) in that the essence of civil conspiracy is the intent to act in concert with another to the detriment of a third party'") (quoting Leatham v. Donell, 1996 WL 1251390, at *2 (Mass.Super. Aug. 9, 1996)). Accordingly, the court will deny the State Defendants' motion to dismiss Counts I and V to the extent those counts apply to them.

### 2. Defamation (Count IV)

In Count IV, Plaintiff asserts a defamation claim against Rubin & Rudman LLP, the law firm, and Cox, one of its members

---

9. The court notes that, although Plaintiff's constitutional claims are only asserted against the State Defendants, it has the discretion to exercise pendent-party jurisdiction over the state-law claims against the other defendants if those claims are sufficiently linked, factually, to Plaintiff's federal claims. See 28 U.S.C. § 1367(a) ("Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties."); Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 558, 587, 125 S.Ct. 2611, 162 L.Ed.2d 502 (2005) (noting that the 1990 amendment to § 1367 "overturned the result in Finley [v. United States, 490 U.S. 545, 549, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989)]" and that "[t]he last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties"); Godin v. Schencks, 629 F.3d 79, 89 n. 4 (1st Cir.2010) ("That § 1367(a) confers on federal courts jurisdiction over state-law claims against non-diverse parties—often termed 'pendent party jurisdiction'—is particularly clear in light of that statute's origins."); see also Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (establishing that supplemental jurisdiction, under Article III, exists if "[t]he state and federal claims ... derive from a common nucleus of operative fact" and the plaintiff "would ordinarily be expected to try them all in one judicial proceeding.").

("Rubin & Rudman Defendants"), for the statements made by Cox at the September 20, 2013 meeting with state officials. At that time, Plaintiff alleges, Cox "indicat[ed]" that Plaintiff "unilaterally authorized [the transfer of $400,000 from WSU to the Foundation] pursuant to his purported authority to expend up to $500,000 without approval from the Board."

In their motion, the Rubin & Rudman Defendants argue that this claim should be dismissed because Cox's statement was (1) truthful, (2) not reasonably susceptible of a defamatory meaning, and (3) privileged. In response, Plaintiff argues that Cox's statement was susceptible to a defamatory meaning because he "falsely indicat[ed] that [Plaintiff] was solely responsible for the maligned $400,000 transfer of public funds to the Foundation, concealing the involvement of other WSU administrators, Board members, independent auditors, and legal counsel." Plaintiff also disputes the contention that Cox's statement was privileged. For its part, the court is persuaded by the Rubin & Rudman Defendants' argument.

■■■■■ "To prevail on a defamation claim 'under Massachusetts law, a plaintiff must show that the defendant was at fault for the publication of a false statement of and concerning the plaintiff which was capable of damaging his or her reputation in the community, and which either caused economic loss or is actionable without proof of economic loss.'" *Damon v. Moore*, 520 F.3d 98, 103 (1st Cir.2008) (quoting *Stanton v. Metro Corp.*, 438 F.3d 119, 124 (1st Cir.2006)). "Thus, to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege facts sufficient to establish that the defendants made '(1) a false and defamatory communication (2) of

and concerning the plaintiff which is (3) published or shown to a third party.'" *Greenspan v. Random House, Inc.*, 859 F.Supp.2d 206, 221 (D.Mass.2012) (quoting *Carmack v. National R.R. Passenger Corp.*, 486 F.Supp.2d 58, 76 (D.Mass. 2007)).

That said, the court has had to determine first, amidst the flotsam and jetsam of Plaintiff's complaint and memoranda, the specific grounds upon which his defamation claim rests. In essence, it appears, Plaintiff alleges that the Boston Globe article accurately reported Cox's statement at the September 20, 2013 meeting (concerning the transfer of money from WSU to the Foundation) as well as the circumstances surrounding that statement. In essence, Plaintiff alleges, in response to a question asked by Freeland and directed at Flynn as to "how [the transfer] happen[ed]," Cox stated that Plaintiff "had authority to spend up to $500,000 without board approval." (Compl. ¶ 248.) [10] Plaintiff further alleges that, via this statement, Cox "indicat[ed]" that Plaintiff "unilaterally authorized that transfer pursuant to his purported authority to expend up to $500,000 without approval from the Board." (Compl. ¶ 246.)

In the court's view, this alleged "indication," as described by Plaintiff, is conclusory and not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. If anything, Plaintiff's allegation is more in the nature of a legal conclusion which may (or may not) support the contention that Cox's statement is susceptible to a defamatory meaning. *Twombly*, 550 U.S. at 564, 127 S.Ct. 1955 ("[O]n fair reading these are merely legal conclusions resting on the prior allegations."); *see also*

---

**10.** Prior to Cox's statement, Flynn stated: "It's a question I don't have an answer to

now." (*Id.*)

*Penalbert–Rosa v. Fortuno–Burset,* 631 F.3d 592, 595 (1st Cir.2011) ("[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'" (quoting *Twombly,* 550 U.S. at 557 n. 5, 127 S.Ct. 1955)). Therefore, it is for the court to decide whether Cox's statement, in view of all the circumstances, is susceptible to the meaning ascribed by Plaintiff and, if so, whether a reasonable person would consider that to be defamatory. *See Amrak Productions, Inc. v. Morton,* 410 F.3d 69, 72 (1st Cir.2005) ("This threshold question, 'whether a communication is reasonably susceptible of a defamatory meaning, is a question of law for the court.'") (quoting *Phelan v. May Dept. Stores Co.,* 443 Mass. 52, 819 N.E.2d 550, 554 (2004)).

 Plaintiff, the court concludes, has failed to allege facts which reasonably suggest that Cox's statement was false or susceptible of a defamatory meaning. First, contrary to Plaintiff's construction of the statement, there is no indication in the statement itself or in its context that Plaintiff is described as acting alone in making the transfer decision. *See Damon,* 520 F.3d at 105 ("[T]he words are to be read in their natural sense with the meaning which they would convey to mankind in general.") (quoting *Joyce v. George W. Prescott Publ'g Co.,* 348 Mass. 790, 205 N.E.2d 207, 207 (1965)). In short, Plaintiff seeks to import a meaning into Cox's statement which is simply absent from the words uttered. *See id.* ("Forced or strained construction of a statement will not suffice to state a claim for defamation.").

At most, Cox's statement might be said to *imply* that the decision to transfer the funds was not formally approved by the Board. (*See* Compl. ¶ 248 ("A Westfield staff member explained that Dobelle had authority to spend up to $500,000 without board approval.").) Plaintiff's complaint, however, fails to allege facts which even suggest that such a statement, if made more forthrightly, would be "false," as Plaintiff alleges. This too is a conclusory allegation not entitled to the presumption of truth. *See Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. As a result, Plaintiff can be said to merely allege in his complaint that the transfer decision was made in consultation with others, only some of whom were Board members. (Compl. ¶ 74.) Thus, the complaint contains no allegation or plausible inference which suggests that the Board itself formally approved the transfer. Accordingly, even taking an expansive view of Cox's statement, Plaintiff fails to sufficiently allege falsity.

 Further, even if the court could somehow construe Cox's statement (or, more accurately perhaps, the implication of his statement) as false, it cannot conclude that it is susceptible to a defamatory meaning. "A communication is susceptible to a defamatory meaning if it 'would tend to hold the plaintiff up to scorn, hatred, ridicule or contempt, in the minds of any considerable and respectable segment in the community.'" *Amrak,* 410 F.3d at 72 (quoting *Phelan,* 819 N.E.2d at 554). "In determining whether a statement is susceptible to a defamatory meaning, '[t]he communication must be interpreted reasonably,' and can only be ruled defamatory if it would lead 'a reasonable reader to conclude that it conveyed a defamatory meaning.'" *Damon,* 520 F.3d at 103–104 (quoting *Amrak,* 410 F.3d at 72). Here, there is no indication from Cox's statement (or the spin Plaintiff wishes to impose on it) that the transfer of funds to the Foundation was wrongful. Rather, it was "state officials" at the meeting—presumably Freeland and Mallone—who ex-

pressed concern that WSU "appeared to be financially propping up the fund-raisers at the ... Foundation, transferring $400,000 to the foundation in 2010 to help cover costs, including [Plaintiff's] expenses." (Compl. ¶ 248.) Cox, of course, cannot be held liable for the statements of others, and there is no suggestion, either in the news article or in the complaint, that he agreed with or verified their concerns. For its part, the court is only obligated to "examine the statement [made by Cox] in its totality in the context in which it was uttered or published." *Amrak*, 410 F.3d at 73. Having done so and for the reasons described, the court will grant the Rubin & Rudman Defendants' motion to the extent it seeks to dismiss Count IV, the defamation claim.

### 3. *Negligent Misrepresentation (Count III)*

In Count III, Plaintiff asserts a negligent misrepresentation claim against O & D for the reports it prepared which, according to Plaintiff, contained false information. O & D seeks dismissal of this claim on the basis that Plaintiff has failed to plead sufficient facts showing that it supplied false information, that such information was relied upon to Plaintiff's detriment, or that Plaintiff suffered damages as a result. The court agrees.

Massachusetts has adopted the following test for claims of negligent misrepresentation against professionals: "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." *Nycal*

*Corp. v. KPMG Peat Marwick LLP*, 426 Mass. 491, 688 N.E.2d 1368, 1371–72 (1998) (quoting § 522 Restatement (Second) of Torts (1977)).

Here, it is not even clear that Plaintiff's claim falls within the rubric of this standard. More to the point, perhaps, Plaintiff has failed to plausibly allege that the reports by O & D contained false information. To be sure, Plaintiff broadly alleges that O & D's reports "contained numerous statements of fact that were incorrect," opinions that were incorrect, and "false information about [Plaintiff]." (Compl. ¶ 232.) These allegations, however, are obviously conclusory and have little merit when measured against dismissal standards. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Granted, Plaintiff's remaining allegations are somewhat more specific, namely, the following: upon seeing one of O & D's draft reports, Plaintiff "was shocked and outraged by the content and unwarranted conclusions" therein; Cox "was also critical of the report and opined that it was not a 'professional product' due to the use of 'syntax, ... cliches and unnecessary opinion' "; and, as a result of O & D refusing to meet with Plaintiff, the report "suffered from a number of glaring deficiencies and inaccuracies," such as failing to indicate "the general mission of the Foundation." (*Id.* ¶¶ 140–44.) Even so, these allegations are woefully inadequate to provide O & D with sufficient notice of Plaintiff's claim. *See Twombly*, 550 U.S. at 565 n. 10, 127 S.Ct. 1955 ("[A] defendant seeking to respond to plaintiffs conclusory allegations ... would have little idea where to begin."). Simply labeling something a misrepresentation, let alone a negligent misrepresentation, does not make it so.

For example, Plaintiff provides no clue as to the content of the alleged false information or why the conclusions

reached in O & D's draft reports were "unwarranted." *See Broderick v. Roache,* 751 F.Supp. 290, 294 (D.Mass.1990) ("In a case such as this one, where the plaintiff has submitted an extremely detailed verified complaint, such a glaring omission is undeniably significant. While '[a] plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim ... when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.'") (quoting *O'Brien v. Di Grazia,* 544 F.2d 543, 544 n. 3 (1st Cir.1976)). Moreover, Plaintiff's one assertion of falsity—O & D's lack of understanding of "the general mission of the Foundation"—does not amount to a serious claim. Finally, to the extent Plaintiff rests his claim on the *opinions* included in the reports, "only statements of fact are actionable; statements of opinion cannot give rise to a ... negligent misrepresentation action." *Cummings v. HPG Intern., Inc.,* 244 F.3d 16, 21 (1st Cir.2001) (citation omitted).

In the end, therefore, the court will grant O & D's motion to the extent it seeks dismissal of Count III, the negligent misrepresentation claim.

### 4. *Tortious Interference (Count I)*

The Rubin & Rudman Defendants and O & D, together, also seek to dismiss Count I, the claim for tortious interference with a contract, as it applies to them. They argue that Plaintiff has failed to allege sufficient facts demonstrating that they knowingly induced a breach of Plaintiff's employment contract or did so through improper motive or means. Again, the court agrees.

▮ "To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Blackstone v. Cashman,* 448 Mass. 255, 860 N.E.2d 7, 12–13 (2007); *see also Draghetti v. Chmielewski,* 416 Mass. 808, 626 N.E.2d 862, 868 (1994) (similar elements for tortious interference with contractual relations). Here, Plaintiff's claims against the Rubin & Rudman Defendants and O & D fail at the second and third prongs.

▮ First, the complaint contains insufficient allegations that these particular defendants knowingly induced a fissure in Plaintiff's employment relationship with WSU. In fact, the allegations often show the opposite. For example, Plaintiff alleges that, after he brought the credit card issue to the attention of both Kevin Queenin, then Chairman of WSU's Board, and Peters, an attorney with Rubin & Rudman, the law firm investigated the matter and essentially cleared him of wrongdoing. (Compl. ¶¶ 78, 80, 82.) In addition, according to the complaint, Cox agreed with Plaintiff in criticizing O & D's report and "encouraged" O & D to "correct" it. (*Id.* ¶ 142.) As for O & D, Plaintiff alleges that, after it presented its findings at the August 29, 2013 special meeting, the Board largely supported Plaintiff and, in fact, "overwhelmingly" voted against Flynn's motion to place a temporary moratorium on presidential travel. (*Id.* ¶¶ 161–62.) It was only after Freeland became involved and withheld critical funding, Plaintiff alleges, that the Board changed its tune. (*See id.* ¶ 184–85.)

▮ Second, even if Plaintiff has sufficiently alleged intentional inducement on

the part of these defendants, he has failed to allege that such inducement was improper in motive or means. As discussed, while Plaintiff alleges that the Rubin & Rudman Defendants defamed him, which would suffice to show improper means if linked to the interference, *see United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 551 N.E.2d 20, 24 (1990), that allegation is conclusory and holds no additional weight in the context of this claim; the same is true as to Plaintiff's allegation that O & D's report contained false information. Nor are there sufficient allegations that the interference, if there was any, was due to any improper motive.

In the end, it is simply not plausible, based on the facts alleged, that the Rubin & Rudman Defendants and O & D are "liable for the misconduct alleged," *i.e.,* tortious interference. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. In the court's view, these defendants were merely bit players in the drama being played out between Plaintiff and the State Defendants. Accordingly, the court will grant the Rubin & Rudman Defendants' and O & D's motions to dismiss Count I as it applies to them.

### 5. *Civil Conspiracy (Count V)*

As a final matter, the Rubin & Rudman Defendants and O & D seek to dismiss Count V, the civil conspiracy claim against them. They argue that there are insufficient allegations that they agreed to a common plan with the State Defendants to commit a tortious act. The court agrees. "Massachusetts recognizes two types of civil conspiracy: true conspiracy and conspiracy based on vicarious liability. *See Taylor [v. American Chemistry Council*, 576 F.3d 16, 34–35 (1st Cir.2009) ]. To establish true conspiracy, plaintiffs must show that 'defendants, acting in unison, had some power of coercion over [plaintiffs] that they would not have had if act-

ing independently.' *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir.1994)." *Inman v. Siciliano*, 2012 WL 1980408, at *16 (D.Mass. May 31, 2012). Conspiracy based on vicarious liability, on the other hand, "requires 'first, a common design or agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement.' " *Id.* (quoting *Aetna Cas. Sur. Co.*, 43 F.3d at 1564). Here, it is clear that Plaintiff is pursuing a claim of conspiracy against the Rubin & Rudman Defendants and O & D based on vicarious liability only.

While Plaintiff alleges that these defendants were substantially involved in the investigation into his use of University credit cards, the court concludes that there are insufficient allegations which plausibly suggest that they entered into a common agreement with the State Defendants to do a wrongful act. "[W]hat is lacking is the showing (or pleading) of an anticipatory agreement, an essential element of common-law conspiracy." *Farrah ex rel. Estate of Santana v. Gondella*, 725 F.Supp.2d 238, 249 (D.Mass.2010). Simply put, the complaint lacks sufficient factual material "to raise a right to relief above the speculative level" as to the Rubin & Rudman Defendants and O & D. *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Accordingly, the court will grant their motions to dismiss the claim as it applies to them.

### IV. CONCLUSION

For the reasons stated, the Rubin & Rudman Defendants' and O & D's motions to dismiss (Document Nos. 31 and 33) are ALLOWED. In addition, the State Defendants' motion to dismiss (Document No. 34) is ALLOWED, as to that portion of Count II which asserts a substantive due process claim, but otherwise DENIED.

The State Defendants shall file their answers to the complaint no later than April 30, 2014.

SO ORDERED.